No. 32,242

The Fourth National Bank of Tulsa, Oklahoma, *Appellee*, v. John T. Smith, *Appellant*.

(44 P. 2d 242)

filed May 4, 1935. Opinion

*C. W. Spencer*, of Sedan, *A. J. Biddison, Harry Campbell* and *W. V. Biddison*, all of Tulsa, Okla., for the appellant.

*Charles L. Yancey, G. C. Spillers, Donald L. Brown* and *E. M. Calkin*, all of Tulsa, Okla., for the appellee.

The opinion of the court was delivered by

Hutchison, J.: This case was commenced by the Fourth National Bank of Tulsa, Okla., against the defendant, John T. Smith, as an ordinary foreclosure action, alleging that the defendant executed a note and mortgage on May 15, 1931, in favor of the Fourth National Bank for $9,800, payable August 3, 1931, with interest. The petition set up payments of principal and interest amounting to $1,379.18, and that there remained due from the defendant $8,500 principal, with interest thereon from May 22, 1933, and that the mortgage given as security was upon land in Chautauqua county, Kansas, which was duly recorded, and had been breached by the defendant, entitling the plaintiff to foreclosure and a first lien on the land.

The defendant answered by way of general denial and alleged that the note and mortgage sued on were given by the defendant without any consideration directly or indirectly, and that the note and mortgage were void for want of consideration; further, that the note

and mortgage were procured from him by the plaintiff under false and fraudulent representations to the effect that plaintiff and its officers represented to defendant that it had procured his notes from the Producers National Bank of Tulsa, Okla., in a valid and regular manner and was the owner thereof and requested him to give the note and mortgage sued on herein; that such statements were false and fraudulent in that the plaintiff had not procured his notes held by the Producers National Bank and was not then and is not now the owner thereof; that they were delivered by someone representing the Producers National Bank to the plaintiff who had no authority to deliver them, and did not convey any authority or ownership of said notes to the plaintiff bank; that the defendant relied upon the statements made by the officers of the plaintiff bank and executed and delivered the note and mortgage herein sued on, but later discovered and ascertained that the plaintiff had no right or ownership in the notes, that the Producers National Bank is still the owner of the notes and that payment to the plaintiff would not release or satisfy the obligation of the defendant to the Producers National Bank; and then, as a cross petition, the defendant alleged that he had .paid in interest and principal to the plaintiff the sum of $3,-618.88 between July 15, 1930, and May 22, 1933, and that such payments were fraudulently obtained by the plaintiff from the defendant, and the defendant is entitled to recover the same with interest at six per cent.

To this the plaintiff replied, denying the allegations of having received the notes from the Producers National Bank without consideration and procuring the present note and mortgage sued on by false and fraudulent representations, admitting that defendant did owe notes to the Producers National Bank and that plaintiff procured them from the Producers National Bank for a good and valuable consideration in a valid and legal manner and admitting it requested the defendant to execute the note and mortgage set out in the plaintiff's petition for the obligation, and alleged that it became the true and lawful owner of defendant's notes which were given to the Producers National Bank, and denied that the Producers National Bank is still the owner thereof or has any interest therein, and states that payment to the plaintiff will result in full satisfaction of the obligation.

It was stipulated at the beginning of the trial that the Fourth

National Bank of Tulsa, Okla., was chartered to do business July 15, 1930, and that its capital stock is $250,000.

Two witnesses, the present cashier of the plaintiff bank and the former cashier of the Producers National Bank, explain the whole transaction with this defendant and the assignment of the assets of the Producers National Bank to the plaintiff bank for the consideration of the plaintiff bank assuming all the legal obligations of the Producers National Bank, and that the Producers National Bank immediately closed its doors and a receiver was appointed to collect double liability from the stockholders of the Producers National Bank; that a written contract was made between the two banks, dated July 15, 1930, which had the approval of the board of directors and the owners of more than two-thirds of the capital stock of the Producers National Bank and was signed by the officers of both banks and had the approval of the comptroller. of currency. The contract is fully set out in the abstract, as well as statement of a note given under such contract by the Producers National Bank to the plaintiff bank for $4,411,725.89, the note being dated July 15, 1930, and to become due June 1, 1932. It shows credits indorsed thereon from July 15, 1930, to June 28, 1933, covering the whole amount except $92,328.71, and interest payments made in the total sum of $85,710.40.

The defendant testified about the Producers National Bank holding two of his notes, one for $7,000 and the other for $1,000, at the time this arrangement was entered into between the two banks; that he was asked by the plaintiff to give a new note and security, which he agreed to do provided the plaintiff bank would increase the loan by $2,000 in cash, which was done, making the new loan $9,800, which was secured by a mortgage.

The defendant was the only witness called to testify in his behalf, and he testified he did not know there was a special ownership of his notes to the Producers National Bank and that he supposed the plaintiff bank owned the notes at the time they returned them to him and he gave the new note.

The trial court rendered judgment for the plaintiff and against the defendant for $9,327.85, with interest from May 8, 1934, and gave an eighteen-months period of redemption, from which judgment the defendant appeals.

The appellant states four legal questions as being involved: (1) That the contract and note between the Producers National Bank

and the Fourth National Bank are absolutely void because beyond the powers of the banks to make such contracts; (2) that the defense of illegality of such contract can be shown by the appellant, although he was not a party to the illegal transaction between the two banks; (3) that the appellee is not the real party in interest herein; and (4) that the appellant is entitled to recover from the appellee the sums of which he has been defrauded by it.

The appellant includes under these principal legal propositions several subordinate ones with reference to the obligation of the contract between the banks and the amount of the loan, as it is claimed to be: That the contract is against public policy because it is intended to perpetrate a fraud on the Producers National Bank and its stockholders, that it is contrary to the civil and criminal law, and that the renewal and extension of the notes did not change the situation or estop the appellant from claiming his rights.

A careful consideration of the many legal propositions raised by the appellant leads to the conclusion that the one first stated and urged by the appellant is almost of decisive importance, viz., whether the contract between the two banks is absolutely void because beyond the powers of the banks making it. Other matters as to the real party in interest, rights of third parties and similar questions raised, are all subordinate to the one question of the validity of such a contract as made by the banks in this case.

Appellant insists that the giving to the plaintiff of the large note exactly equal to deposits and other obligations of the Producers National Bank was a new obligation or a loan to it in excess of ten per cent of the capital of plaintiff bank, and cites in support of his contention the recent case of *Thomas v. Hubbard,* 4 Fed. Supp. 520, where it was contended that the note given created a new obligation and was therefore void, and the court said:

"Had the agreement created a new indebtedness, that position would have been correct, but such was not the case. We have here a situation where the Third National Bank merely changed many creditors into one. That is a perfectly lawful arrangement and one within the power of the Third National Bank to make." (p. 521.)

That action was by the receiver of the failing national bank to recover an assessment against a stockholder because of the failed condition of the bank. The Third National Bank of Pittsburg had by authority of its directors and without any action of the stockholders sold all of its assets to the Mellon National Bank,

which in consideration thereof assumed all the liabilities of the Third National Bank. This was done pursuant to an agreement entered into by both banks the day after the doors of the Third National Bank were closed, and the Mellon National Bank accepted a note of $500,000 given by the Third National Bank contemporaneously with the execution of the contract. The agreement was that the Mellon bank would liquidate and convert into cash the assets so transferred to it and apply the proceeds thereof to pay the expenses of liquidation and administering the assets, to reimburse itself for the amount paid out on liabilities assumed with interest, and to return the balance of said assets if any remained after making the payments specified. In addition to the quotation above made from the opinion in this case, the court cited numerous authorities where such contracts had been upheld against similar objections, and quoted from one of them, namely, *Hightower v. Amer. Natl. Bank*, 263 U. S. 351, the language of Mr. Justice Van Devanter, as follows:

"The remaining contention is that the debt sought to be enforced was created during the process of liquidation, and therefore is not one for which the shareholders are liable. The premise is faulty. The debt arose from the contract and represents moneys advanced in excess of what was realized from the assets. . . . There was power to make the contract. The purpose was not to obtain money to engage in new business but simply to change from many creditors to one." (p. 360.)

The opinion in the Thomas case, *supra*, then adds:

"That fits the situation in the instant case exactly. If the suit were by the Mellon National Bank as a creditor to enforce liability against the stockholders of the Third National Bank, we should be obliged to hold the agreement valid." (p. 521.)

Appellant cites the case of *Federal Intermediate Credit Bank v. L'Herrisson*, 33 F. 2d 841, which emphasizes the ten-per-cent rule stated in section 84, 12 U. S. C. A. This was where a failing bank assigned some of its assets to a depositor to secure the same in order to retain the deposit, and it does not come under the broad language of another section of the same act concerning national banks, being 12 U. S. C. A., § 24 (7), all subject to the approval of the comptroller of currency.

Appellant also cites cases where banks made discrimination in the payment of its depositors, gave notes indorsed by the bank in lieu of their deposits, and guaranteed payment to another bank of checks to be drawn in the future.

Several cases from Kansas and other states are cited holding certain contracts are void because they were fraudulent or against public policy, but we are here concerned exclusively with the question of two national banks making a contract, one assuming all the obligations of the other and taking a note and an assignment of all of its assets.

In the case of *Richter v. Laredo Nat. Bank*, 62 F. 2d 289, a stockholder in the First National Bank brought an action on behalf of the bank and against the Laredo National Bank alleging the First National Bank was not insolvent when it entered into the contract with the Laredo bank and that the contract was illegal and void. The liabilities of the First National Bank were assumed by the Laredo bank and the First National Bank assigned to it all of its assets and gave it a note for $160,000, the estimated amount that the liabilities would exceed the assets, and it was there held:

"The agreement, plain and clear on its face, was entered into in good faith by the two banks; it was approved by the representative of the comptroller; it was in the interest of the First bank, whose primary obligation was the protection of its depositors; and it was by the Laredo bank carried out exactly as agreed. . . . That this transaction, entered into in good faith, without fraud, and for the best interests of the bank, was not in its nature illegal or beyond the powers of the corporation, is clear. . . . The contract in this case was designed to, it did, accomplish the very purpose of the statute. It was made with a view to insuring the payment of all its depositors and creditors and the prevention of the preference of any." (p. 290.)

In the case of *Wannamaker v. Edisto Nat. Bank of Orangeburg*, 62 F. 2d 696, the circuit court of appeals affirmed the ruling of the district court in dismissing the action, which was one brought in equity by certain stockholders of the Orangeburg National Bank against· the receiver of that bank and the Edisto National Bank, to enjoin a stockholders' liability assessment and to secure an accounting for the assets of the Orangeburg bank coming into its possession under a contract between the two banks by which the Edisto bank assumed the payment of all the liabilities of the Orangeburg bank except the stockholders' liability and received from the Orangeburg bank $100,000 in cash and certain selected assets amounting to more than $670,000 and also a note for $710,850.14 with six per cent interest, secured by collateral. The contract was approved by the directors of the Orangeburg bank and by the comptroller of the currency, but was not approved by two-thirds of the stockholders. The opinion states that the bill of complaint abounds in charges of

fraudulent schemes and designs on the part of the Edisto bank. As to some of the deviations from the definite provisions of the statute, the court said:

"These provisions, however, are designed to govern the actions of a board of directors in conducting the affairs of a solvent going concern, and not to render the board powerless to act so as to safeguard the assets when the corporation is insolvent or in imminent danger of becoming so. . . . that a transfer of assets, in consideration of an assumption of a liability, by one national bank on the verge of insolvency to another, was within the general authority of the board of the failing bank under R. S. § 5136 (7), 12 U. S. C. § 24 (7), 12 U. S. C. A. § 24 (7), to exercise all such incidental powers as should be necessary to carry on the business of banking." (p. 700.)

Appellant insists that these two decisions are not applicable to the contract in the case at bar, the difference being in the first case that the note was only for the excess of the indebtedness over assets, instead of being as in the case at bar for the entire obligation, and in the second that "there is no element of a loan of credit," as is claimed to be in the case at bar.

In the case of *City Nat. Bank of Huron, S. D., v. Fuller,* 52 F. 2d 870, it was held by the circuit court of appeals that—

"Transfer of assets, in consideration of assumption of liabilities of national bank on verge of insolvency, to another national bank by virtue of resolution of boards of directors, held legal and not *ultra vires* of either bank [12 U. S. C. A. § 24 (7)]." (Syl. ¶ 1.)

It was held by the supreme court of the United States in the case of *Hightower v. Amer. Natl. Bank,* 263 U. S. 351, that—

"A contract between two national banks under which the assets of the one were transferred to the other and the latter assumed the liabilities of the former and advanced money, in excess of the assets, to pay the liabilities and expenses, construed as intending, not a sale, but a pledge of the assets, as security for repayment of the money advanced." (Syl. ¶ 1.)

In the case of *First Nat. Bank v. Harris,* 27 F. 2d 117, the court made the following statement in the opinion pertinent to some of the provisions criticized in the contract in the case at bar:

"It was an out-and-out sale of assets in consideration of an assumption of liability with an accounting over for any surplus realized." (p. 124.)

It was held by the circuit court of appeals of the eighth circuit in the case of *Schofield v. State Nat. Bank,* 97 Fed. 282:

"A contract by a national bank to assume and pay the liabilities of another bank in consideration of the transfer to it by the other bank of its office furniture and lease and its cash and cash assets, and the further assignment to a trustee for its benefit of bills receivable and securities, is not *ultra vires,* but is

within its powers conferred by statute to conduct a general banking business." (Syl. ¶ 3.)

We conclude in harmony with these strong and convincing federal decisions in favor of the power and authority of two national banks entering into a contract such as the two banks did in this case, and that such a contract is not void but valid, that it was not a loan of credit nor a new indebtedness or obligation of the assigning bank, but merely the changing of many creditors into one.

There was no evidence of fraud produced on the trial, except as may have been shown by the contract and other exhibits in connection therewith and the testimony of the defendant that the facts with reference to the contract were misrepresented to him and he did not discover that they were misrepresentations until suit had been commenced against him. And now since we uphold the validity of the contract, the misrepresentations vanish and change into true and correct statements, as far as this court is concerned.

It would serve no beneficial purpose in taking up and considering the many other legal propositions raised and discussed in the briefs, because they all hinge and depend upon the contract and note being void and invalid.

The judgment is affirmed.